**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Ascencio Daniel COVARRUBIAS, Juan
Luis Ochoa, Defendants–Appellees.**

**No. 98–30167.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1999.

Decided June 14, 1999.

---

Gregory Shogren, Assistant United States Attorney, Yakima, Washington, for plaintiff-appellant.

Richard A. Smith, Smith Law Firm, Yakima, Washington, for defendant-appellee Ascencio Daniel Covarrubias.

Gregory Scott, Law Office of Gregory L. Scott, Yakima, Washington, for defendant-appellee Juan Luis Ochoa.

Before: FLETCHER, REINHARDT, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

This appeal arises out of the questioning of defendants by state and federal officers before and after the appointment of counsel. The arrest of defendants Ascencio Daniel Covarrubias and Juan Luis Ochoa was planned and executed by officers of the Sunnyside Police Department with the assistance of a federal immigration agent. The local police and the federal agent both conducted interrogations of the defendants about possible state and federal crimes. The charges against the defendants, initially filed in state court, were dismissed, and the defendants were subsequently charged in federal court for a different offense, arising out of the same course of conduct.

When federal and state authorities cooperate in arresting a suspect and deciding which jurisdiction will prosecute him, an increasingly common occurrence in an era in which many offenses are made punishable under both state and federal law, they must take care to insure that the suspect's constitutional rights are not violated in the process. Here, such care was not taken, and the result was the breach of the defendants' Sixth Amendment right to counsel. We affirm the district court's decision that the Sixth Amendment violation required suppression of the statements that the defendants made to a federal officer after counsel had been appointed to defend them against the state charges.

## BACKGROUND

On December 18, 1997, in return for payment of a few hundred dollars, defendants Covarrubias and Ochoa allegedly drove eight individuals, some of whom may have been undocumented immigrants, from Los Angeles, California to Washington state in Covarrubias's recently purchased van. They dropped off seven of these individuals in Washington state, four in Yakima and three in Mount Vernon. The defendants then brought the last individual, Martin Hernandez, to the arranged location in another Washington city, Sunnyside, but did not drop him off because of a dispute over payment.[1] Although the defendants told the police that Hernandez voluntarily remained with them in the van in order to wait for his wife to raise the money that he owed them, the police had reason to believe that he was being held against his will: Hernandez's wife had contacted the police and told them that the defendants were holding him for ransom. With her cooperation, the police executed a plan to apprehend the defendants. The police gave her $700; she contacted the defendants and told them that she had the money; and they arranged to meet her. When she handed over the money, Hernandez left the van, and the police made the arrests.

The Sunnyside Police Department officers arrested the defendants on the charge of kidnapping Hernandez. Aware that Hernandez was in the country illegally, the officers had previously enlisted the services of INS Special Agent Abe Gonzalez, and he participated in the planning of the arrest of the two defendants as well as the arrest itself.

Covarrubias and Ochoa were taken to the Sunnyside Police Department, where Detective Trevino questioned Covarrubias and Officer Jarin Whitley questioned Ochoa. Both defendants waived their *Mi-*

---

1. In their statements to the police officers, the defendants claimed .that Hernandez's wife was supposed to meet them with $900, $200 of which was to pay them for the ride and the remainder of which was to reimburse them for a $700 payment they made on Hernandez's behalf to the people who had brought him across the Mexican border.

*randa* rights and answered the questions that the police posed about facts relevant to the state kidnapping allegation as well as to the transportation of Hernandez and the other individuals to Washington state.[2] After the interview, Covarrubias and Ochoa were taken to the Yakima County Jail. The next day, Covarrubias and Ochoa appeared for preliminary hearings on the state kidnapping charge, at which time counsel was appointed for both defendants.

■ Later that day, Agent Gonzalez visited the Yakima County Jail to interview Covarrubias and Ochoa.[3] He interrogated them regarding matters pertinent to each of the charges—the state kidnapping charge and the potential federal charge of transporting illegal aliens.[4] Agent Gonzalez was subsequently listed as a witness for the state in its prosecution.

However, the state prosecution never really commenced. On February 5, 1998, the state dismissed without prejudice the criminal charges against Covarrubias and Ochoa. The motion and order of dismissal gave the following reason: "Promise of federal prosecution for charge(s) arising out of same incident."[5] The defendants were immediately transferred into federal custody and, on March 3, 1998, were indicted on two federal charges, one count of transporting and moving an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(B) and a forfeiture count.

The defendants then brought a motion in federal district court to suppress the statements that they had made to Detective Trevino, Officer Whitley, and Agent Gonzalez, on Fifth Amendment, Sixth Amendment, and Vienna Convention grounds. The district court held an evi-

2. Among other questions, the police officers asked who the van belonged to, how the defendants came to be in Sunnyside (which Covarrubias answered by explaining his agreement to transport Hernandez and the financial arrangements that were made), what "the situation [was] surrounding the transport," how many other individuals were transported to Washington state and where these individuals were from, and whether Hernandez had been held against his will.

3. The government disputes the district court's finding that, at the time Agent Gonzalez interrogated the defendants, he was aware that the defendants had been arraigned and counsel had been appointed. The district court found that, based on his experience, Gonzalez would have been aware of this fact. Gonzalez's testimony at the probable cause hearing—which took place before any suppression motion was filed—supports such a finding. He admitted that he was aware that counsel would have been appointed on the state charges by the time he interviewed the defendants. In contrast, in his subsequent testimony at the evidentiary hearing on the suppression motion, Gonzalez merely insisted that he was unconcerned about whether counsel had been appointed and that he therefore did not ask and did not know for sure what had transpired. Under these circumstances, the district court did not clearly err in making its finding as to Gonzalez's actual knowledge. Moreover, given that Gonzalez was working closely with the Sunnyside police in their investigation of

the defendants, we may impute knowledge of the fact that counsel was appointed. *See Michigan v. Jackson,* 475 U.S. 625, 634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) ("Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court).").

4. Agent Gonzalez asked questions about the defendants' own immigration status, their transporting of the other illegal immigrants to Washington state and the financial arrangements for the trip, the defendants' prior experience with transporting illegal immigrants, their knowledge of the immigration status of the individuals they were transporting, what had happened regarding Hernandez's inability to pay, whether Hernandez had been forced to remain in the van against his will, what statements the defendants had made to Hernandez, and whether Hernandez had been kidnaped for ransom. Both defendants waived their *Miranda* rights and answered Gonzalez's questions.

5. The government points out that this note was handwritten, but the significance of this fact is not apparent. In his testimony, Agent Gonzalez denied that any promise of federal prosecution was made.

dentiary hearing at which the three law enforcement officers and Ochoa testified.

The district court rejected the defendants' Fifth Amendment and Vienna Convention arguments and denied the motion to suppress the statements that the defendants had given to the Sunnyside police. However, it held the Sixth Amendment claim to be meritorious and ordered the statements to Agent Gonzalez suppressed. The court found that the Sixth Amendment right to counsel had attached to the state kidnapping charge when the defendants were arraigned and counsel was appointed. Recognizing that the Sixth Amendment right to counsel is generally offense-specific, the district court concluded that two exceptions to this rule caused the right to counsel to extend to the federal charges: (1) the federal transporting charge was "intextricably intertwined" with the state kidnapping charge; and (2) by questioning the defendants, who had been arrested and charged as a result of a joint state-federal effort, the federal government had acted to circumvent the defendants' right to counsel. It found that each exception provided an independent basis for suppressing the statements.

The government filed an interlocutory appeal.

## DISCUSSION

■■■ The Sixth Amendment right to counsel attached to the state kidnapping charge when adversary judicial proceedings were initiated. *See United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). We extend strict protections of the right to counsel when "a 'suspect' has become an 'accused,'" *Jackson,* 475 U.S. at 632, 106 S.Ct. 1404, because it is at that point "'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a

defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Gouveia,* 467 U.S. at 189, 104 S.Ct. 2292 (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). Once this right attaches, the government may no longer initiate interrogation of a suspect, and even a written waiver of the right to counsel is invalid. *See Jackson,* 475 U.S. at 635, 636, 106 S.Ct. 1404. However, "the Sixth Amendment right ... is offense specific" and prohibits government initiated interrogation only regarding the offense to which the right to counsel has attached, *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)—in this case, the state kidnapping charge. Applying the Supreme Court's Sixth Amendment right to counsel jurisprudence, appellate courts have recognized two clear exceptions to this offense-specific requirement: the "inextricably intertwined" or "closely related" exception and the "circumvention of Sixth Amendment right" exception. We need consider only the first here.[6]

On the basis of a uniform reading of two Supreme Court cases, every circuit to consider the question, including our own, has recognized that "[a]n exception to the offense-specific requirement of the Sixth Amendment occurs when the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." *Hines,* 963 F.2d at 257 (citing *United States v. Cooper,* 949 F.2d 737, 743–44 (5th Cir.1991)); *see also United States v. Melgar,* 139 F.3d 1005, 1013–15 (4th Cir.1998); *United States v. Doherty,* 126 F.3d 769, 776 (6th Cir.1997); *United States v. Arnold,* 106 F.3d 37, 42 (3d Cir.

---

6. The second exception applies when "the government breach[es] its 'affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.'" *United*

States v. Hines, 963 F.2d 255, 258 (9th Cir. 1992) (quoting *Maine v. Moulton,* 474 U.S. 159, 171, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)); *see also United States v. Martinez,* 972 F.2d 1100, 1105–06 (9th Cir.1992).

1997); *United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993); *United States v. Carpenter,* 963 F.2d 736, 740 (5th Cir.1992); *United States v. Mitcheltree,* 940 F.2d 1329, 1342 (10th Cir.1991); *United States v. Nocella,* 849 F.2d 33, 37–38 (1st Cir. 1988). *But cf. Hellum v. Warden, United States Penitentiary–Leavenworth,* 28 F.3d 903, 909 (8th Cir.1994) (acknowledging exception without deciding whether to adopt it).

While the Supreme Court has not expressly adopted the "inextricably intertwined" exception to the offense-specific nature of the Sixth Amendment—or, as some circuits have described it, the "closely related" exception [7]—it has implicitly applied it in its Sixth Amendment decisions. In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the defendant was arraigned on a charge of abduction and transported by police officers to another location. 430 U.S. at 391, 399, 97 S.Ct. 1232. During the car ride, the police officers elicited statements about the location of the missing child's body, and the defendant was reindicted on a charge of first degree murder. *Id.* at 393, 97 S.Ct. 1232. The Court held that the defendant's waiver of his Sixth Amendment right to counsel was invalid and that the statements he made to the police identifying the body's location were therefore inadmissible. *Id.* at 404–06, 97 S.Ct. 1232. Thus, although the Sixth Amendment right to counsel had formally attached only to abduction charges, the Court treated the right as if it also applied to murder charges involving the same incident and victim.

Similarly, in *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), a defendant had been indicted for four counts of theft by receiving. His co-defendant subsequently approached the police and agreed to serve as an informant by recording conversations with the defendant. As a result of the information the co-defendant gathered, officials learned that the defendant had not only received stolen automobiles and parts but had committed acts of burglary in obtaining these stolen items. Prosecutors dismissed the original indictment and brought new indictments which included additional charges, and the court found the defendant guilty of the new burglary charges as well as the thefts that formed the basis of the original indictment. 474 U.S. at 162–167, 106 S.Ct. 477.

The Court rejected the state's justification for recording the conversations—which was that the police were investigating additional crimes including the defendant's alleged plan to kill a witness—and held the defendant's statements to be inadmissible. Although the right to counsel had formally attached only to the theft by receiving charge, the Court also affirmed the state supreme court's reversal of the defendant's burglary convictions, while allowing for the possibility that the information could be used in a subsequent trial regarding the plan to kill the witness. *Id.* at 180, 106 S.Ct. 477. The indisputable implication of these two Supreme Court cases is that the right to counsel may attach to other offenses as long as there is a close enough relationship to the conduct that formed the basis for the initially charged crime.

The case that first approved this exception in the Ninth Circuit failed to identify the specific factors that we are to consider in determining whether two offenses are

---

7. *See Melgar,* 139 F.3d at 1011 (using "closely related" and "inextricably intertwined" interchangeably); *Arnold,* 106 F.3d at 40–41 (characterizing "closely related" and "inextricably intertwined" as "two terms which we take to mean the same thing"); *Hellum,* 28 F.3d at 909 (citing *Hendricks v. Vasquez,* 974 F.2d 1099, 1104 (9th Cir.1992)) (framing exception as whether charges "arise from the same incident"); *Carpenter,* 963 F.2d at 740–41 ("extremely closely related" used along with "inextricably intertwined"); *Mitcheltree,* 940 F.2d at 1341 (right to counsel also attaches to "very closely related crimes which arise out of the same course of conduct as the charged offenses"); *Nocella,* 849 F.2d at 37 (right attaches to offenses that are "closely linked to" those to which right to counsel has already attached).

inextricably intertwined or closely related. However, in rejecting the defendant's contention that the offenses fell within that exception, our opinion suggested some elements of the requisite inquiry; we concluded that because "the place, time, and persons involved were all different[,]" there was too much of a distinction between the offenses. *Hines*, 963 F.2d at 257. In a later case we offered some additional guidance when we stated that the inquiry focuses on the nature of the conduct involved rather than on the elements of the offense itself. *See Martinez*, 972 F.2d at 1104; *Doherty*, 126 F.3d at 776 (same).

█ Deciding whether the exception is applicable requires an examination and comparison of all of the facts and circumstances relating to the conduct involved, including the identity of the persons involved (including the victim, if any), and the timing, motive, and location of the crimes. No single factor is ordinarily dispositive; nor need all of the factors favor application of the exception in order for the offenses to be deemed inextricably intertwined or closely related—which concepts we, like some of the other circuits, deem to be the same. *See* note 7 *supra.* The greater the commonality of the factors and the more directly linked the conduct involved, the more likely it is that courts will find the exception to be applicable. For example, in a case involving a defendant who had committed two distinct crimes at separate points in time—threatening a witness and then attempting to hire someone to kill that witness—the Third Circuit held that the two offenses were closely related because the intended victim of both crimes was the same, the offenses arose "from the same facts and circumstances," the conduct was "closely related in time," and the two acts were in furtherance of the same purpose. *Arnold*, 106 F.3d at 41–42. In contrast, courts have concluded that offenses were *not* closely related when the "factual predicate" differed—that is, when the other individuals involved, the time, and the location were all different. *See United States*

*v. Kidd*, 12 F.3d 30, 33 (4th Cir.1993) (cocaine distribution conspiracy which ended in May 1992 not inextricably intertwined with subsequent cocaine sale in August 1992); *Hendricks v. Vasquez*, 974 F.2d 1099, 1104–05 (9th Cir.1992) (as amended) (charge of flight to avoid prosecution on Los Angeles murder charge not inextricably intertwined with San Francisco murder charges); *Carpenter*, 963 F.2d at 741 (burglary charge not closely related to possession of firearm by felon, when crimes took place at different times and firearm was not linked to burglary); *Nocella*, 849 F.2d at 38 (marijuana possession not related to later offenses of cocaine distribution and threatening witness).

█ In the instant case, in concluding that the charges were inextricably intertwined, the district court reasoned:

> The state kidnapping charges and federal charges for transportation of an illegal alien arose from the same conduct. The Government's evidence in this case alleges that Defendants unlawfully transported Hernandez from Los Angeles to the state of Washington, in reckless disregard for his alien status and then unlawfully detained Hernandez against his will when he did not have sufficient funds to pay for his transfer.

The government counters that the federal offense was completed when the defendants left Los Angeles with the intention of transporting illegal immigrants, and that the state offense did not begin until they began holding Hernandez for ransom. Therefore, it contends, the dates, times, locations, and victims (Hernandez in one case, the United States in the other) of the state and federal offenses differed.

The government's interpretation is a strained and artificial one. The federal crime of transporting illegal immigrants was a continuing offense; it was in progress as long as the defendants were transporting Hernandez—and thus the timing of the federal and state crimes did in fact overlap. Moreover, even if one offense commenced upon the termination of the

other, the two offenses involved a continuous course of conduct. In addition, the identity of the persons involved in the state crime corresponds closely with those involved in the federal crime; Covarrubias and Ochoa were the perpetrators of both offenses and Hernandez was involved in both, as the victim of the state offense in one case and as one of the aliens unlawfully transported in violation of federal law in the other. Although the federal crime was committed in multiple locations between Los Angeles and Washington state, both crimes took place, at least in part, in Sunnyside, Washington; however, even without the last fact, the continuous course of conduct would be controlling. The defendants' motive in committing both crimes was identical: they sought to obtain financial remuneration for transporting Hernandez and the other immigrants. And finally, both crimes arose from the same set of facts: Ochoa and Covarrubias picked up Hernandez (and seven others) in Los Angeles and drove them to Washington state in return for money.[8] The crimes were extremely closely related and the district court did not err in finding the exception applicable.

Because our holding that the offenses were "inextricably intertwined" or "closely related" provides a sufficient basis to affirm the district court's suppression order, we do not consider whether the district judge was also correct in holding the "circumvention of Sixth Amendment right" exception applicable as well.

AFFIRMED.

**8.** Practical proof of the degree to which the offenses were closely related may be found in the overlapping nature of the interrogations; it would have been difficult to confine one's questioning to the facts and circumstances of one offense without straying into a discussion of the other.