**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose Roman ORTEGA, aka Romualdo Roman Ortega, Defendant–Appellant.**

**No. 98–10323.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1999.

Decided Feb. 1, 2000.

Ann Hargrove Voris, Assistant Federal Public Defender, Fresno, California, for the defendant-appellant.

Kenneth B. Julian, Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

Before: PREGERSON and WIGGINS, Circuit Judges, and CARTER,[1] District Judge.

WIGGINS, Circuit Judge:

Jose Roman Ortega appeals his jury conviction and sentence for multiple drug— and firearm-related offenses. We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

In doing so, we find that an INS agent violated the Sixth Amendment when he obtained, outside the presence of Ortega's counsel, Ortega's statement regarding the firearm used during the offenses. The tainted statement, however, may still be used for impeachment purposes. We also find that the district court did not err by limiting Ortega's cross-examination of the INS agent to only inculpatory portions of Ortega's statement. Last, we find that the

trial court's jury instruction for aiding and abetting a conspiracy did not undermine the jury instruction for conspiracy.

## I.

On August 25, 1997, Ortega's co-defendant Ramon Jose Coronado sold 309 grams of methamphetamine to undercover police officer Candido Alvarez. On September 3, 1997, Alvarez introduced Coronado to Sergeant Greg Hernandez, who posed as a buyer of methamphetamine. Coronado agreed to sell to Alvarez two pounds of methamphetamine.

On September 16, 1997, Coronado told Alvarez that he was prepared to deliver the methamphetamine. At a highway rest stop, Coronado made telephone calls allegedly to Ortega.[2] Afterwards Coronado told Alvarez that he was going to pick up the methamphetamine from his source and would later give Alvarez instructions to complete the transaction. Coronado then drove to Ortega's residence while being followed by surveillance officers. At the residence, Ortega dug up the methamphetamine from the yard. Before leaving the residence, Ortega put a .22 caliber pistol in his waistband in order to protect himself from other drug traffickers. When Coronado and Ortega were ready, Coronado paged Alvarez and Hernandez and instructed the two to drive to the rest stop. Thereafter, Ortega drove himself and Coronado to the rest stop. When all had arrived, Ortega gave the methamphetamine to Alvarez.

At that point, Alvarez and Hernandez arrested Ortega and Coronado with the assistance of other officers. The officers also seized the methamphetamine and the pistol from Ortega. After waiving his Miranda rights, Ortega confessed to the following: (1) He lived at the residence from

---

1. The Honorable David O. Carter, United States District Judge for the Central District of California, sitting by designation.

2. The evidence is in dispute here. The prosecution claims that the phone calls were made

to Ortega. The defense claims otherwise because Coronado conducted the phone conversations in English, but Ortega speaks only Spanish.

which the methamphetamine came; (2) an unnamed cousin gave him the methamphetamine; (3) he arranged to sell the methamphetamine to Coronado's friend; (4) he dug up the methamphetamine from his yard prior to driving to the rest stop; (5) he carried the gun to the drug transaction for his personal protection; and (6) the pistol belonged to him although it was given to him by his cousin.

During a search of Ortega's residence, the officers found in Ortega's bedroom a sawed-off shotgun, a pay-owe sheet with drug trafficking information, a counterfeit green card, and a loaded semi-automatic rifle. Ortega admitted that the bedroom was his alone and that the items seized belonged to him. In the dining room, the officers found a telephone bill in Ortega's name, a piece of paper with Coronado's name and phone number, and plastic packaging material and duct tape similar to that used to wrap the methamphetamine. In the garage, the officers found indicia of methamphetamine manufacturing, including a cutting agent, filter masks, pseudoephedrine (a main ingredient for making methamphetamine), and a triple-beam scale.

On September 17, 1997, Ortega made his initial appearance on the drug charges and was appointed counsel. Nine days after counsel had been appointed, INS agent Hector Bencomo questioned Ortega, outside defense counsel's presence, to determine his immigration status and to investigate possible immigration-related crimes. During the interview, Bencomo and Ortega discussed the source of the pistol that was used during the drug transaction; Ortega told Bencomo that a friend had lent him the pistol to kill chickens.

At the trial, during the presentation of the government's case-in-chief, Officer Lopez, one of the officers who had arrested Ortega and searched Ortega's residence, testified about the inculpatory portions of Ortega's confession. He did not testify, however, about Ortega's non-self-inculpatory explanations, such as Ortega's having

received the pistol and the drugs from his cousin. During the presentation of his case, Ortega denied any knowing participation in the transaction with Coronado. He also testified that the firearms found on his waistband and in his bedroom belonged to his cousin. On rebuttal, as a means of impeaching Ortega's testimony that he received the pistol from his cousin in order to take care of it for the cousin, INS agent Bencomo testified that Ortega said that a friend lent him the pistol to kill chickens.

The trial court instructed the jury to consider Bencomo's testimony solely for the purposes of assessing Ortega's credibility. It then instructed the jury on the elements of conspiracy and the elements of aiding and abetting a conspiracy. On April 22, 1998, a jury found Ortega guilty of (1) conspiring to distribute methamphetamine and to possess it with the intent to distribute, (2) distributing methamphetamine, (3) possessing methamphetamine with the intent to distribute, (4) carrying a firearm during a narcotics offense, (5) possessing firearms as an alien, and (6) possessing an unregistered firearm.

## II.

### A. *Violation of the Sixth Amendment Right to Counsel*

▮ Whether a defendant was denied his Sixth Amendment right to counsel is a question of law reviewed de novo. *See United States v. Moore,* 159 F.3d 1154, 1158 (9th Cir.1998). An individual obtains the "strict protections of the right to counsel when 'a suspect has become an "accused." ' " *United States v. Covarrubias,* 179 F.3d 1219, 1223 (9th Cir.1999) (quoting *Michigan v. Jackson,* 475 U.S. 625, 632, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). Because Ortega had formally appeared in federal court and was appointed counsel on September 17, 1997, his Sixth Amendment right to counsel had attached. "[O]nce this right to counsel has attached and has been invoked, any subsequent waiver dur-

**680**

ing a police-initiated custodial interview is ineffective." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Jackson,* 475 U.S. at 632–33, 106 S.Ct. 1404 (ruling that the defendants' statements to officers during a police-initiated interview—even if made pursuant to a voluntary, knowing, and intelligent waiver—after the defendants were arraigned and appointed counsel, should have been suppressed); *see also Covarrubias,* 179 F.3d at 1223 (stating that once the right to counsel attaches, the government may no longer "initiate interrogation of a suspect" even if there has been a written waiver). Ortega therefore argues that the interview conducted on September 26, 1997, by INS agent Bencomo outside the presence of counsel violated his Sixth Amendment rights.

■ The government asserts that the INS did not violate Ortega's Sixth Amendment right because at the time of the interview, the government had only charged Ortega with a drug offense. During the interview, INS agent Bencomo questioned Ortega about the source and ownership of the pistol that was used at the time the drug transaction occurred. The government argues that because the purpose of the INS interview was to determine Ortega's immigration status and to investigate immigration-related crimes, it was constitutional to question Ortega about an offense different from the one charged. The government is correct in noting that the Sixth Amendment right to counsel is offense-specific and therefore prohibits government-initiated interrogation only regarding the offense to which the right of counsel has attached. *See McNeil,* 501 U.S. at 175, 111 S.Ct. 2204 (1991); *Covarrubias,* 179 F.3d at 1223. The present situation, however, falls within an exception to the offense-specific requirement.

■ This exception exists "when the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending

charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." *Covarrubias,* 179 F.3d at 1223 (quoting *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992)). This court recently set forth the test for determining whether or not this exception applies:

> Deciding whether the exception is applicable requires an examination and comparison of all of the facts and circumstances relating to the conduct involved, including the identity of the persons involved (including the victim, if any), and the timing, motive, and location of the crimes. No single factor is ordinarily dispositive.... The greater the commonality of the factors and the more directly linked the conduct involved, the more likely it is that courts will find the exception to be applicable.

*Covarrubias,* 179 F.3d at 1225.

■ Here, the drug offenses and the gun offenses arose from exactly the same facts and circumstances. The offenses occurred at the same time and location, involved the same parties, and were tried together. Ortega's motive for carrying a gun is directly linked with the drug charges: He told an officer that he took the gun for protection during the drug transaction. Moreover, the government failed to cite to any cases in which this court or the Supreme Court ruled that crimes arising from the same facts and circumstances constituted separate and unrelated offenses to which the offense-specific requirement does not apply. In sum, the portion of the INS interview relating to the gun offenses violated the Sixth Amendment because the drug offenses—to which Ortega had already been charged—and the gun offenses were inextricably intertwined.

The interview violated Ortega's Sixth Amendment right to counsel even though the interview was conducted by an INS officer, not the prosecutor. The INS officer, an agent of the federal government, interviewed Ortega only after the DEA informed him that Ortega had been arrest-

ed and was being held in jail. Moreover, while interviewing Ortega, the INS officer expressly asked Ortega about his possession of a gun when he was arrested by the DEA. Accordingly, we find that the INS officer's interrogation of Ortega about the gun offense, outside the presence and without the consent of Ortega's court-appointed counsel, blatantly violated the Sixth Amendment.

The prosecutor made a statement to the district court that leads us to believe that the INS agent's interview of Ortega was not unusual. Specifically, the prosecutor informed the court that "routinely immigration officers make contact with incarcerated individuals who have counsel to determine their immigration status. That is part of the BORCAP[3] Program and Special Agent Bencomo can attest to that." This statement suggests that the government, via INS agents, routinely questions represented clients outside the presence and without the consent of counsel. This practice is troubling because it may easily result in a violation of the Constitution, professional ethics, and the Department of Justice's Rule that "an attorney for the government may not communicate, or cause another to communicate with a represented party who the attorney for the government knows is represented...." 28 C.F.R. § 77.5 (1998); *see also* ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 4.2; CAL. RULES PROF. CONDUCT, Rule 2–100. It should be made clear to the government that interviewing an incarcerated individual outside the presence of counsel is constitutionally permissible only if the interview pertains solely to the individual's immigration status, rather than to information related to crimes for which he or she has been charged.

B. *Use of Statement Obtained in Violation of the Sixth Amendment for Impeachment Purposes*

█ Although the INS interview violated the Sixth Amendment so that the state-

ments relating to the gun offenses may not be admitted as substantive evidence in the government's case-in-chief, the government may still use these statements to impeach Ortega's inconsistent testimony. *See Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (holding that a statement taken in violation of the prophylactic rule—that once defendant invokes his Sixth Amendment right to counsel, subsequent waiver of that right is presumed invalid if secured pursuant to police-initiated conversation—may be used to impeach defendant's inconsistent testimony). This is so because Ortega assumed a reciprocal obligation to "speak truthfully and accurately" when he exercised "his right to testify on his own behalf." *Id.* at 351, 110 S.Ct. 1176 (quoting *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)). In cases involving the use of a defendant's voluntary statements, the Supreme Court has decided that the " 'search for truth in a criminal case' outweighs the 'speculative possibility' that exclusion of evidence might deter future violations" of procedural safeguards not directly compelled by the Constitution, such as the prophylactic rule in this case. *Id.* at 351–52, 110 S.Ct. 1176 (quoting *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)).

### III.

Prior to trial, the government moved to preclude Ortega from eliciting his own exculpatory statements, which were made within a broader, inculpatory narrative. The district court granted the government's motion, barring Ortega from eliciting, among others, the following exculpatory statements on cross-examination of a law enforcement officer: (1) that the firearms found in the residence belonged to Ortega's cousin; (2) that Ortega was given the methamphetamine from an unnamed cousin; and (3) that Ortega had no knowl-

---

3. BORCAP stands for "Border Patrol Criminal Alien Program."

edge of the methamphetamine or the indicia of drug trafficking found in the garage attached to his shared residence.

On appeal, Ortega contends that the court's ruling violated the rule of completeness and the Confrontation Clause. He also argues that Ortega's exculpatory statements were admissible as prior consistent statements under Federal Rule of Evidence 801(d)(1) and would have been offered to rebut the government's charge of recent fabrication. Finally, Ortega asserts that the district court should have introduced these exculpatory statements under Federal Rule of Evidence 807 in order to serve the interests of justice. In response, the government argues that Ortega's statements constitute inadmissible hearsay. The government further asserts that the rule of completeness does not apply to these oral statements. Finally, the government argues that the limitation on Ortega's ability to cross-examine the officer did not violate the Confrontation Clause.

■■■■ We review de novo whether the district court correctly construed a hearsay rule. *See United States v. Montero–Camargo,* 177 F.3d 1113, 1123 (9th Cir. 1999), *amended by* 183 F.3d 1172 (9th Cir.1999). And we review exclusion of evidence under a hearsay rule for abuse of discretion. *See United States v. Matta–Ballesteros,* 71 F.3d 754, 767 (9th Cir. 1995), *amended by* 98 F.3d 1100 (9th Cir. 1996). Whether limitations on cross-examination are so severe as to violate the Confrontation Clause is a question of law reviewed de novo. *See United States v. Bensimon,* 172 F.3d 1121, 1128 (9th Cir. 1999). Confrontation Clause violations are also subject to harmless error analysis. *See United States v. Gillam,* 167 F.3d 1273, 1277 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 235, 145 L.Ed.2d 197 (1999).

■■■■ For the following reasons, we affirm the exclusion of Ortega's non-self-inculpatory statements. First, Ortega's non-self-inculpatory statements are inadmissible even if they were made contemporaneously with other self-inculpatory statements. *See Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). The self-inculpatory statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, *see* Fed. R.Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay. *See Williamson,* 512 U.S. at 599, 114 S.Ct. 2431 (finding that "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts [which are hearsay]"). If the district court were to have ruled in his favor, Ortega would have been able to place his exculpatory statements "before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids." *United States v. Fernandez,* 839 F.2d 639, 640 (9th Cir.1988). Thus the district court did not abuse its discretion when it limited Ortega's ability to elicit his exculpatory hearsay statements on cross-examination.

■■■■ Second, the rule of completeness, *see* Fed.R.Evid. 106 (requiring that the redacted version of a statement not distort the meaning of the statement), applies only to written and recorded statements. *See United States v. Collicott,* 92 F.3d 973, 983 (9th Cir.1996) (finding that "rule 106 'does not compel admission of otherwise inadmissible hearsay evidence'") (quoting *Phoenix Associates III v. Stone,* 60 F.3d 95, 103 (2d Cir.1995)). Because the officer's testimony concerned an unrecorded oral confession, the rule of completeness does not apply. Even if the rule of completeness did apply, exclusion of Ortega's exculpatory statements was proper because these statements would still have constituted inadmissible hearsay. *See Collicott,* 92 F.3d at 983.

■■■■ Third, a court may impose reasonable limits on cross-examination without violating the Confrontation Clause. *See United States v. Dees,* 34 F.3d 838, 843

(9th Cir.1994). Precluding Ortega from eliciting inadmissible hearsay on cross-examination, given that he testified to the statements himself, is not the type of severe limitation on cross-examination that violates the Confrontation Clause. *See id.; see also Fernandez*, 839 F.2d at 640 (finding that due process does not require that the defendant be allowed to present exculpatory hearsay statements). The officer's testimony did not distort the meaning of Ortega's statements because Ortega testified to the statements not mentioned by the officer: that his cousin supplied Ortega with the pistol and that the same cousin gave Ortega the methamphetamine. Furthermore, Ortega's testimony did not infringe upon his Fifth Amendment right not to testify because he had already testified prior to the officer's testimony. Ortega should not be allowed to use the Confrontation Clause as a means of admitting hearsay testimony through the "back door" without subjecting himself to cross-examination. *See Fernandez*, 839 F.2d at 640.

## IV.

■ Ortega argues that the government did not present sufficient evidence to establish a conspiratorial agreement, a necessary element for establishing a conspiracy, between him and his co-defendant Coronado. *See United States v. Disla*, 805 F.2d 1340, 1348 (9th Cir.1986) (listing the elements of conspiracy). He also argues that he did not exercise dominion and control over the methamphetamine, as required for a conviction for conspiracy to possess narcotics. *See United States v. Vasquez–Chan*, 978 F.2d 546, 550 (9th Cir. 1992). We review the question of evidence sufficiency de novo. *See United States v. Tucker*, 133 F.3d 1208, 1214 (9th Cir.1998). There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virgi-*

*nia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Deeb*, 175 F.3d 1163, 1168 (9th Cir.1999). Viewing the evidence in the light most favorable to the government, we find that there is sufficient evidence to uphold Ortega's conspiracy conviction.

■ A conspiracy may be proven by circumstantial evidence. *See Disla*, 805 F.2d at 1348 (9th Cir.1986). Proof of a formal agreement is very uncommon given that " 'most conspiracies are clandestine in nature.' " *United States v. Iriarte–Ortega*, 113 F.3d 1022, 1024 (9th Cir.1997), *amended by* 127 F.3d 1200 (9th Cir.1997) (finding that "secrecy and concealment are essential features of successful conspiracy") (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.4(d) (1986)). Jurors can infer whether an agreement existed from the defendants' conduct. *See Iriarte–Ortega*, 113 F.3d at 1024. Evidence of coordinated activities between the defendants is convincing circumstantial evidence of an agreement. *See id.* (finding that "as the degree of coordination between conspirators rises, the likelihood that their actions were driven by an agreement increases"); *see also United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir.1992) (finding that "[t]he high degree of coordination between [co-defendants] is sufficient evidence from which a jury could find agreement").

■ Factors a court may consider in analyzing co-defendants' coordinated activity include a close association between the co-defendants, frequent contacts, and a commonality of time and goals. *See Disla*, 805 F.2d at 1349. The following coordinated activities satisfy these factors: (1) Coronado drove to Ortega's residence after he told the undercover police officers that he was ready to deliver the methamphetamine; (2) Ortega dug up two pounds of methamphetamine from his yard; (3) Ortega and Coronado drove together to meet the undercover officers; (4) Ortega, who was sitting on the methamphetamine, delivered it to the officers; and (5) when

arrested, Ortega confessed that he and Coronado arranged to sell the methamphetamine.

The foregoing coordinated activities prove that Ortega did much more than merely associate with Coronado. *See United States v. Bautista–Avila*, 6 F.3d 1360, 1362 (9th Cir.1993) (stating that mere association with conspirators is insufficient to support a. conspiracy conviction). Likewise, by digging up the methamphetamine from his own yard and then sitting on it during delivery, Ortega exercised control over the narcotics. *See Vasquez–Chan*, 978 F.2d at 550. Given Ortega's coordination with Coronado and given Ortega's exercise of control over the methamphetamine, there was sufficient evidence to convict Ortega on the conspiracy count. *See United States v. Mares*, 940 F.2d 455, 458 (9th Cir.1991) ("[Even e]vidence of a slight connection [to the conspiracy] ... is sufficient to convict a defendant of knowingly participating in an established conspiracy.").

V.

Ortega argues that the district court's jury instruction on aiding and abetting a conspiracy eliminated the requirement of an agreement for conspiracy, undermined the government's burden of proof, and thus allowed the jury to convict Ortega without proof of an agreement. We disagree. A district court's formulation of jury instructions are entirely in its discretion. *See People of Territory of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir.1985). And its formulation of a jury instruction is reviewed for abuse of discretion. *See United States v. Service Deli, Inc.*, 151 F.3d 938, 942 (9th Cir.1998). We find that the district court did not abuse its discretion in formulating the following aiding-and-abetting jury instruction:

> First, *the crime charged in that count of the indictment was committed;* [s]econd, the defendant knowingly and intentionally aided ... induced, or procured another person to commit that crime;

and [t]hird, that defendant acted before the crime was completed. ...

(emphasis added). By instructing the jury that it first had to find that the crime charged, conspiracy in this case, was committed, the district court implicitly instructed the jury that it first had to find an agreement between Ortega and Coronado. Repetition of the conspiracy instruction in the aiding and abetting instruction was not required. *See United States v. Vaandering*, 50 F.3d 696, 702 (9th Cir.1995) (finding that in a prosecution for conspiracy to possess controlled substances, possession of the same substances with intent to distribute, and other related offenses, the trial court's aiding-and-abetting instruction does not even need to indicate the counts to which the instruction is tied). Per the aiding-and-abetting instruction, the jury first had to find that Ortega had entered an agreement to conspire with Coronado before it could then deliberate on the aiding and abetting charge. Thus the aiding-and-abetting instruction did not undermine the conspiracy instruction, and we affirm the district court's jury instruction formulation.

AFFIRMED.