104 Cal.Rptr.2d 259 (2001)
87 Cal.App.4th 40
The PEOPLE, Plaintiff and Respondent,
v.
Werner KELLER, Defendant and Appellant.
No. C033613.
Court of Appeal, Third District.
February 14, 2001.
Review Granted May 23, 2001.
*261 George O. Benton, under appointment by the Court of Appeal, Santa Rosa, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Stephen G. Herndon, *262 Supervising Deputy Attorney General, David Andrew Eldridge, Deputy Attorney General, for Plaintiff and Respondent.
*260 NICHOLSON, J.
In December 1998, while in jail after being arraigned for crimes he allegedly committed against his wife in November 1998, defendant Werner Keller solicited a supposed hit man to attack her and to dissuade her from testifying against him. Defendant did not know that he was speaking to an undercover police detective and that his conversations with the "hit man" were being tape-recorded. After defendant was led to believe the hit man had killed his wife, and defendant paid for the dirty work, he was charged with solicitation for his December 1998 conduct.
A jury found defendant guilty of two counts of violating Penal Code section 653f, subdivision (a)[1] for soliciting the undercover officer to (1) commit assault with a deadly weapon or instrument or by force likely to produce great bodily injury against his wife, Rebecca Keller (count one); and (2) dissuade Rebecca from attending or testifying as a witness in a legal proceeding by the use of force or a threat of force (count two). The jury acquitted defendant of falsely imprisoning Rebecca (count three). (§ 236.) The court sentenced defendant to three years in prison.
Defendant contends he received ineffective assistance of counsel because his trial attorney failed to object to evidence of his conversations with the undercover officer, assertedly introduced in violation of his Sixth Amendment right to counsel. His claim relies on a so-called exception to the rule that the Sixth Amendment is "offense specific." We conclude no such exception exists. The Sixth Amendment is a bulwark of liberty, not a fortress from which cowards can safely launch attacks on the innocent with impunity. Once a person is victimized, her assailant may not hide in the shadow of the Sixth Amendment while he tries to dissuade her from testifying and, if necessary, destroy her.
Defendant also claims the court erred by failing, sua sponte, to instruct the jury on the defense of entrapment with respect to count one. We disagree. As we reject both of defendant's claims, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.

Prosecution Case on False Imprisonment Count
On November 13, 1998, Henry Habra heard Rebecca knocking on doors and asking someone to call the police because "he" was going to kill her. She sounded frightened. Brandon Ballard heard Rebecca yelling for help and saw defendant force her into the apartment. A minute later, defendant and Rebecca left in a car.
Police Officer Daniel Wanamaker was at the scene when they returned. Defendant was driving. He was arrested and jailed. A complaint filed the same day charged defendant with false imprisonment, kidnapping, and other offenses. Defendant was arraigned and an assistant public defender was appointed to represent him on November 17, 1998. (Defendant was not yet charged with solicitation because those crimes had not yet been committed.)

B.

Prosecution Case on Solicitation Counts
On December 1, 1998, jail inmate Frederick Scott, who was serving a sentence for spousal abuse in the same jail unit as defendant, contacted Detective Desiree Carrington to inform on defendant. Based on the information received, Carrington told Scott to give defendant the number for a telephone at the sheriffs department.
The next day, Carrington asked Detective Michael Bennett to help investigate a possible solicitation case by posing as a hit man named "John." Bennett received five phone calls from defendant at the number Scott gave defendant. Tape recordings of *263 the calls were admitted in evidence as People's Exhibits 3 and 4, respectively. Both tapes were played for the jury.[2]
In the December 2 phone call, defendant said "Doc" (referring to informant Scott) told him to call. When Bennett asked, "What's up," defendant replied, "I need you to scare the shit out of my wife." Bennett asked, "What do you want me to do to scare her?" Defendant answered, "What ever [sic] comes to mind. I don't care. Shake her up."
Defendant said Rebecca claimed he beat her and that he was facing 10 years for kidnapping, and told Bennett to get her to call the district attorney and recant the kidnapping accusation. Defendant gave him Rebecca's address, and described her and her car. Defendant offered to give Bennett an Omega watch as payment.
Defendant told Bennett, "... you're gonna stop her somewhere, tell her she's gonna recant, she's gonna stop the divorce, she's gonna get the restraining order lifted." When Bennett asked, "And what if she says no man?," defendant replied, "Cut her up." Bennett sought clarification: "Cut her up what? I mean [do you just] want her scared? Do you want her hurt? What do you want?" Defendant responded, "For right now I just want her scared." When Bennett expressed concern Rebecca might identify him, defendant suggested Bennett also threaten her three children, whose names and places of residence he provided.
Defendant told Bennett, "I have my whole life riding on this phone call." Bennett replied, "Well yeah me too. It could be. So if I'm gonna cut her up the price goes up." Defendant asked, "Pardon me," to which Bennett said, "I said if I'm gonna cut her up the price goes up." Rather than instructing Bennett not to "cut her up," defendant told him, "But I ... can't pay you right now. I mean I'm glad to pay you as soon as I get out of here." After defendant said he had no assets other than the watch because Rebecca had taken everything, the following colloquy occurred:
"[BENNETT]: Oh sounds like she deserves it then doesn't it?
"[DEFENDANT]: I know she deserves it. But you know the real thing, all I want right now, is to scare the daylight out of her and say `Look you're gonna do this or we're gonna start shooting your kids.'
"[BENNETT]: Alright. Alright. I usually don't use guns man. I usually use knives.
"............................
"[DEFENDANT]: What ever. What ever it doesn't make any difference to me....
"[BENNETT]: Well guns leave back bullets and shit and people....
".............................
"[DEFENDANT]: Okay. I don't care.
Then tell her we gonna ... cut `em up whatever. Tell her you got the names and address.
"[BENNETT]: Yeah. What if she dies if I cut her up? What if she dies?
"[DEFENDANT]: Then I got to live with that.
"[BENNETT]: So you just want her cut up if she doesn't buy into this or what?
"[DEFENDANT]: Yeah.
"[BENNETT]: Alright. You don't care if she lives or dies.
"[DEFENDANT]: No."
Defendant agreed to pay Bennett an additional $800 if necessary. The conversation continued:
"[DEFENDANT]: ... You know but I don't really ... want her dead.

*264 "[BENNETT]: You what?
"[DEFENDANT]: I don't want her dead.
"[BENNETT]: You don't want her dead.
"[DEFENDANT]: No. I want her to be scared to death. And to call the DA and say, `Look I made up the story (which is the truth) I made up the story. I wanted to drop the restraining order and I wanted to drop the divorce.'"
Bennett asked for more details and defendant provided them:
"[BENNETT]: Okay? So I mean do you want her scared? What do you want? You said to scare her, but how do you want me to scare her? Just buy [sic] saying those things?
"[DEFENDANT]: Yeah I mean just you know rough her up a little bit. I mean don't, you know, hurt her. You know, beat her up or whatever.
"[BENNETT]: Alright. And if she's not gonna cooperate then that's when I'm supposed to cut her up right?
"[DEFENDANT]: Yeah.
"[BENNETT]: Alright. And then at that point you don't care if she lives or dies.
"[DEFENDANT]: I don't care anymore."
Later in the same call the following discussion happened:
"[BENNETT]: Alright. Just so I understand you. So I'm supposed to go out there and I'll rough her up a little bit and tell her what I want her to do.
"[DEFENDANT]: Right.
"[BENNETT]: If she's [sic ] basically tells me to fuck off or pound sand, then I cut her up.
"[DEFENDANT]: Yep."
In the course of the call, Bennett reminded defendant that if he had to "take it to the next level," then the "price goes up a little bit." Defendant said he would find a way to come up with the extra $800 in that event. Bennett said, "I'm gonna hold you to it.... [Y]ou don't want me as your enemy." Defendant also reiterated his instructions to Bennett as follows:
"[DEFENDANT]: The only ... thing I want is just as I say you know, rough her up. Get her to ... drop all the bullshit divorce, the restraining order, and recant with the DA.
"[BENNETT]: Right. I understand that.
"[DEFENDANT]: Just tell her ... you're watching her from here on out. You know, just scare her to death. I mean you know what's your doing.
"[BENNETT]: I know what I'm doing. [¶] ... But what I'm saying if she tells me to pound sand, then we take it to the next level and the price goes up a little bit. [¶] ... And I'm just saying this, if ... she's, if, man if she's not scared or if she's not gonna recant, then it goes to the next level. And what ever happens, happens.
"[DEFENDANT]: Okay. That's fine."
Defendant called Bennett again at 5:10 p.m. the next day, December 3, 1998. Bennett continued the pretext by stating he had killed Rebecca. He then told defendant a man named Ron Yamazaki would be coming to the jail to collect the watch. Defendant asked, "How do I know the job is done, John?" Bennett told defendant to sign over the watch, and the men then had the following discussion:
"[BENNETT]: ... I want the watch. I did my job man, and the price has gone up eight hundred bucks. She's dead. She's gone. He's gonna meet with you tonight at visiting. Alright?
"[DEFENDANT]: He's gonna meet with me?
"[BENNETT]: Yeah. And you'll see a picture of her. "[DEFENDANT]: Okay.
"[BENNETT]: ... I want the watch you understand?
"[DEFENDANT]: You got it.
"[BENNETT]: And you owe me another eight hundred do you understand?

*265 [DEFENDANT]: Yeah.
"...................................
"[BENNETT]: I got the body with me. Do you think I'm gonna leave it there? I got to get out of town man. I want the watch because I got to get some money and I got to get out of town for a while.
"[DEFENDANT]: Have that guy, have that guy be here and see me. "[BENNETT]: He will see you. "[DEFENDANT]: Okay. And he has a picture?
"[BENNETT]: Yes.
"[DEFENDANT]: Okay....
"[BENNETT]: You owe me man.
"[DEFENDANT]: You got it.
"[BENNETT]: You ... understand? You owe me!
"[DEFENDANT]: I owe you.
"[BENNETT]: It wasn't supposed to go this way!
"[DEFENDANT]: Do what?
"[BENNETT]: It wasn't supposed to go this way!
"[DEFENDANT]: No.
"[BENNETT]: Alright. You owe me. You understand? You better be good for that eight hundred bucks.
"[DEFENDANT]: I'll get it for you."
In another phone call to Bennett on December 3, defendant said he would not sign over the watch unless he had proof his wife was dead:
"[BENNETT]: ... Are you trying to rip me off now?
"[DEFENDANT]: No. Why?
"[BENNETT]: I'll tell you what. You'll see the picture. But I want the watch.
"[DEFENDANT]: You got it. There's no question about it. But I want to get, I want to see it before I sign the ... paperwork.
"[BENNETT]: So now you're trying to screw me.
"[DEFENDANT]: No. Why?
"[BENNETT]: Here you're eight hundred bucks in the hole to me. I just went and did you a fucking favor and now you're rolling on me?
"[DEFENDANT]: No. Why? All I'm asking for is show me the proof and that's it.
"[BENNETT]: And you'll sign the watch over?
"[DEFENDANT]: Yeah. There's no question about it. I mean you got to understand me too John. [¶] ... All I need is have the guy come over here and show me some sort of a picture."
Defendant called Bennett again on December 3, and was told Yamazaki would be coming to the jail with a photo. Defendant wanted more details about the killing, and Bennett provided a fictitious account.
Deputy George Malim watched defendant at the jail while he made the phone calls. Immediately after the December 2 call, defendant sought out Scott and had a lengthy conversation with him. At the end of their talk, the men shook hands. Defendant's demeanor was calm and businesslike; he did not cry.
Defendant was expressionless after the December 3, phone call in which he was led to believe Rebecca had been killed, though he seemed more excited or animated than he had been the day before.
At 7:30 p.m. on December 3, Department of Justice special agent Ron Nakabayashi, posing as Yamazaki, visited defendant at the jail. Their conversation was secretly tape recorded and a transcript of the recording was provided to the jury.
Nakabayashi showed defendant a staged photograph purporting to depict Rebecca's deceased, blood-covered body. Defendant stared at the photo for about 30 seconds but did not cry or exhibit any other emotion. Right after viewing the photo, defendant began discussing arrangements to release *266 the watch. He expressed no concern for his wife but did ask to see the photo a second time. Again, he displayed no emotion or remorse and began talking about the watch transaction. Defendant then signed the release for the watch.

C.
Defense Case
Defendant testified he and Rebecca met on April 28, 1998, married two weeks later, and had separated more than once. In October 1998, they agreed to try and work things out, and on November 9, 1998, defendant drove to Roseville, where Rebecca had rented an apartment.
On November 12, 1998, Rebecca told defendant about her sexual contact with her therapist. Defendant ordered her to report the therapist to police and then went to the bedroom to get his cigarettes. When he did, Rebecca ran out of the house, banged on doors, and yelled, "Help me, he is going to kill me." Defendant said this was a show.
Defendant grabbed her, told her to stop, and pulled her back into the apartment. He told her he was leaving her. Rebecca apologized and willingly went with him to get her mail in Auburn. Police officers arrived about 30 seconds after they returned home. Defendant was arrested.
While awaiting arraignment, defendant met inmate Scott, whom he knew as Doc. Scott was in jail for spousal abuse. Scott tried to befriend defendant, and they discussed the latter's case. (Neither the prosecution nor the defense called Scott as a witness.)
A few days later, Scott said he received only a 210 day sentence because "[t]here was blood on the floor when I was done with her." Scott also said, "If you want me to, I can help you." Scott claimed he knew a man on the outside who would make sure Rebecca would not testify. Scott told defendant to have her killed. Defendant said, "Are you crazy?," to which Scott replied, "No. Can be arranged."
Defendant did not want his wife killed. He told Scott he only wanted Rebecca scared so she would tell the truth. However, Scott wanted her cut up, saying that would get the message across. Defendant did not want Rebecca cut up, but said Scott "was working on me. He was needling me."[3] Later, Scott told defendant the hit man's name was John and gave him the phone number.
Defendant testified Scott also gave him instructions after giving him John's phone number. He told defendant to call John, that John would ask him certain questions, and that defendant would need to ask John to cut her up or John would hang up the phone, leaving defendant without his services. As defendant said at trial, "So I thought, you know what? What do I care? I wanted to move it along." He did not want his wife dead, and surmised John was talking about that only because he thought defendant might be an informant.
Under cross-examination, defendant admitted he believed John was really a hit man, that John had done that sort of thing at least twice before, and that John was capable of killing for money. Defendant further conceded that he wanted John to scare Rebecca.

DISCUSSION

I.

No Ineffective Assistance of Counsel On Sixth Amendment Theory
Defendant argues his trial attorney was ineffective for not moving to exclude the evidence (tapes and testimony) of his conversations with Detective Bennett.[4] *267 He claims admitting that evidence to prove any or all of the three counts on which he was tried violated his right to counsel because, at the time he spoke with Bennett, that right had already attached to the false imprisonment charge which was "inextricably intertwined" with the prospective solicitation crimes. He asserts a better result was likely had counsel objected, because there was no other evidence of the solicitation crimes of which he was convicted.
We disagree. First, the evidence was not inadmissible as to the solicitation charges, which were not based on the same crime or same course of criminal conduct as the false imprisonment charge and simultaneously chargeable with it. Second, although the evidence should have been suppressed as to false imprisonment, defendant was acquitted of that charge, and thus he suffered no prejudice as the result of the claimed misstep by his counsel.

A.

History of Charges
Defendant was originally charged in a complaint (No. 62-5698) with committing four crimes against Rebecca on November 13, 1998: corporal injury; kidnapping; false imprisonment; and terrorist threats. On November 17, 1998, counsel was appointed to defend him on those charges.
In January 1999, after his December 1998 conversations with Bennett, defendant was charged in a grand jury indictment with two counts of soliciting crimes against Rebecca on December 3, 1998. (§ 653f, subd. (a).)
After an April 1999 preliminary hearing, defendant was charged by information (No. 62-5698) with falsely imprisoning Rebecca and other crimes.
For various reasons, defendant was tried only on the indictment's two solicitation counts and the information's false imprisonment count, presented to the jury as counts one, two and three, respectively.

B.

Sixth Amendment Analysis In General
The general legal principles derive from the United States Supreme Court's decisions in Massiah v. United States (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and Maine v. Moulton (1985) 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481, and are summarized in the California Supreme Court decision In re Wilson (1992) 3 Cal.4th 945, 13 Cal.Rptr.2d 269, 838 P.2d 1222.
Under Massiah v. United States, supra, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, "once an adversary criminal proceeding has been initiated against the accused, and the defendant's constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the defendant in the absence of counsel is inadmissible at trial against that defendant." (In re Wilson, supra, 3 Cal.4th at p. 950, 13 Cal.Rptr.2d 269, 838 P.2d 1222.)
However, "attachment of the right to counsel with regard to one charge does not immunize a defendant from investigation of other criminal conduct, and `[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are ... admissible at a trial of those offenses.' [Citations.] Incriminating statements obtained *268 in circumvention of a defendant's right to counsel with respect to a charged offense, however, are inadmissible at the trial of that charged offense even if they pertain to a new and uncharged crime." (In re Wilson, supra, 3 Cal.4th at pp. 950-951, 13 Cal.Rptr.2d 269, 838 P.2d 1222, italics in original, quoting Maine v. Moulton, supra, 474 U.S. at pp. 178-180 & fn. 16, 106 S.Ct. 477.)
Thus, generally speaking, (1) evidence of defendant's conversations with Bennett was admissible to prove the solicitation charges (counts one and two) as to which no right to counsel had attached prior to the conversations; but (2) such evidence was inadmissible to prove the false imprisonment charge (count three) as to which his Sixth Amendment right to counsel had previously attached.[5]
In other words, as the United States Supreme Court has held, the Sixth Amendment right to counsel is "offense specific." (McNeil v. Wisconsin (1991) 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166 ["The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced"].) Applying that rule, the McNeil court rejected the view that a defendant's right to counsel was infringed when, after his right to counsel had attached on an armed robbery charge, he was interrogated without counsel about an unrelated, uncharged murder, attempted murder and armed burglary. (Id. at pp. 173-174, 111 S.Ct. 2204.)
However, defendant cites a so-called "exception" to the offense-specific rule recognized by some intermediate federal and state appellate courts to argue the evidence of his conversations with Bennett was inadmissible even as to the solicitation charges because those charges were "inextricably intertwined" with the false imprisonment charge. In short, based on that exception, he asserts his right to counsel applied also to the solicitation charges.[6] We disagree, because there is no such exception. Even if there were such an exception, it is not as broad as defendant supposes, and it would in no event assist him here.

C.

There Is No Exception to the Offense-Specific Rule
The United States Court of Appeals for the Ninth Circuit first recognized a purported exception to the offense-specific rule in United States v. Hines (9th Cir. 1992) 963 F.2d 255, and then attempted to define the proper application of the exception in United States v. Covarrubias (9th Cir.1999) 179 F.3d 1219.
The Covarrubias court conceded that the United States Supreme Court had not expressly adopted any such exception. (United States v. Covarrubias, supra, 179 F.3d at p. 1224.) However, the Ninth Circuit opined that the United States Supreme Court implicitly applied the exception in Brewer v. Williams (1977) 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 and Maine v. Moulton, supra, 474 U.S. 159, *269 106 S.Ct. 477, 88 L.Ed.2d 481. (United States v. Covarrubias, supra, 179 F.3d at p. 1224.) We conclude the Ninth Circuit has misapplied the applicable United States Supreme Court decisions.
In Brewer, a 10-year-old girl disappeared. (Brewer v. Williams, supra, 430 U.S. at p. 390, 97 S.Ct. 1232.) Later, someone saw the defendant put a bundle containing the girl in his car and drive away. (Id. at p. 390, 97 S.Ct. 1232.) The defendant ultimately surrendered, was arraigned for kidnapping, and then transported by police car to another location. (Id. at pp. 390-391, 97 S.Ct. 1232.) During the trip police, by means of a "Christian burial speech," elicited statements from defendant as to the location of her body, to which he directed them, and he was thereafter indicted, tried and convicted for murder. (Id. at pp. 392-394, 97 S.Ct. 1232.)
Brewer held defendant had not waived his right to counsel and therefore the statements he made in the car after attachment of the right were inadmissible. (Brewer v. Williams, supra, 430 U.S. at pp. 402-404, 406, fn. 12, 97 S.Ct. 1232.) Thus, according to United States v. Covarrubias, supra, 179 F.3d at page 1224, "although the Sixth Amendment right to counsel had formally attached only to abduction charges, the Court treated the right as if it also applied to murder charges involving the same incident and victim."
The Covarrubias court's interpretation of Brewer is simplistic, however, since in Brewer there was really only a single crime (murder), or two crimes (kidnapping and murder) which were one for practical purposes since they were part of a single course of criminal conduct. (It appears the defendant in Brewer was initially charged with kidnapping only, because at the time the girl was not known to be dead; nothing in Brewer suggests he was tried for kidnapping.) Brewer did not even implicitly articulate an exception to the offense-specific rule.
Nor did the Supreme Court apply an exception to the offense-specific rule in Maim v. Moulton, supra, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481. There, Moulton and Colson were arraigned on four counts of theft by receiving stolen cars and car parts with the knowledge they were stolen and with the intent to deprive their owners of possession. (Id. at p. 162, 106 S.Ct. 477.)
Colson confessed to the charged crimes and told police he and Moulton had also burglarized an adjacent business to steal the parts, set fire to a truck, and committed other thefts. (Maine v. Moulton, supra, 474 U.S. at pp. 162-163, 106 S.Ct. 477.) Colson agreed to help prosecute Moulton on the pending charges. (Id, at p. 163, 106 S.Ct. 477.) Colson also told police Moulton suggested killing a witness. (Id at pp. 162, 163, 106 S.Ct. 477.)
Colson met Moulton while wearing a body wire to record what was said at the meeting. (Maine v. Moulton, supra, 474 U.S. at pp. 164-165, 106 S.Ct, 477.) The police chief said he had Colson wear the wire to record their conversation about threats to witnesses, but he also knew the two men were meeting to discuss the pending charges. (Id. at p. 165, 106 S.Ct. 477.)
In the meeting, Colson and Moulton briefly mentioned eliminating witnesses, and then discussed the pending charges at length; Colson elicited incriminating statements from Moulton. (Maine v. Moulton, supra, 474 U.S. at pp. 165-166, 106 S.Ct. 477.) The opinion did not mention whether the men discussed the burglary, as to which Moulton had not yet been charged.[7]
Moulton was later reindicted and tried on the prior pending "theft by receiving" charges, plus new charges of burglary, arson and theft. (Maine v. Moulton, supra, *270 474 U.S. at p. 167, 106 S.Ct. 477.) The prosecution introduced a portion of the meeting with Colson regarding the prior pending theft charges, but not the part about killing witnesses. (Ibid.) The decision did not state whether a portion of the meeting regarding burglary, if any, was admitted in evidence.[8]
At trial, Moulton was convicted of theft and burglary, but acquitted of arson. (Maine v. Moulton, supra, 474 U.S. at p. 167, 106 S.Ct. 477.) The Supreme Judicial Court of Maine reversed and remanded for a new trial because Moulton's incriminating statements were not admissible "regarding crimes as to which charges were already pending." (Id. at p. 168, 106 S.Ct. 477.) However, the state court also held his statements were admissible to prove crimes as to which adversary proceedings had not yet been commenced. (Ibid.) The Supreme Court opinion does not specify the uncharged crimes to which the state court was referring.[9]
The United States Supreme Court affirmed the decision of the state court. (Maine v. Moulton, supra, 474 U.S. at p. 180, 106 S.Ct. 477.) In so doing, the Supreme Court stated:
"In seeking evidence pertaining to pending charges, ... the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights ... invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah. On the other hand to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained simply because other charges were pending at the time, would frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel. [Fn. 16 omitted.]" (Maine v. Moulton, supra, 474 U.S. at pp. 179-180, 106 S.Ct. 477 italics added.)
In footnote 16, appearing at the end of the passage just quoted, the Supreme Court reiterated: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." (Maine v. Moulton, supra, 474 U.S. at p. 180, fn. 16, 106 S.Ct. 477.) There was no further specification by the Supreme Court of the uncharged crimes to which it was referring.
Since Moulton was charged only with theft by receipt of stolen property at the time of his conversations with Colson, the conversations were inadmissible only as to those charges. They remained admissible to prove the uncharged offensesburglary, arson, and the plan to kill witnesses. (Maine v. Moulton, supra, 474 U.S. at pp. 168, 180, 106 S.Ct. 477; Maine v. Moulton, supra, 481 A.2d at p. 160.)
Thus, Covarrubias decision reads too much into Maine v. Moulton in a crucial *271 respect when it says: "Although the right to counsel had formally attached only to the theft by receiving charge, the Court also affirmed the ... reversal of the defendant's burglary convictions, while allowing for the possibility that the information could be used in a subsequent trial regarding the plan to kill the witnesses. ([Maine v. Moulton, supra, 474 U.S. at p. 180, 106 S.Ct. 477], italics added.)" (United States v. Covarrubias, supra, 179 F.3d at p. 1224.) As shown, the Supreme Court did not limit Moulton's retrial to the witness offense or expressly foreclose retrial on the burglary charge. Hence, we reject Covarrubias's view that the United States Supreme Court has impliedly adopted an exception to the offense-specific rule.
Finally, we observe that Brewer v. Williams, supra, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 and Maine v. Moulton, supra, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481, the cases from which the Ninth Circuit infers an exception to the offense-specific rule, were both decided years before McNeil v. Wisconsin, supra, 501 U.S. at page 175, 111 S.Ct. 2204 which made it clear that the Sixth Amendment right to counsel is "offense specific." Thus, we conclude the United States Supreme Court has neither explicitly nor implicitly recognized an exception to the offense-specific rule.
Covarrubias also observed United States v. Hines, supra, 963 F.2d 255, "failed to identify the specific factors that we are to consider in determining whether the two offenses are inextricably intertwined or closely related." (United States v. Covarrubias, supra, 179 F.3d at pp. 1224-1225.)
Covarrubias undertook to do so (not too successfully, as will appear) after first summarizing the tests applied by some other federal appellate courts, i.e., "whether charges `arise from the same incident'"; whether they are "`extremely closely related' "; and whether the uncharged offenses are "`very closely related crimes which arise out of the same course of conduct as the charged offenses.'" (United States v. Covarrubias, supra, 179 F.3d at p. 1224, fn. 7.)
The Ninth Circuit synthesized those disparate tests to form its own ad hoc test: "Deciding whether the exception is applicable requires an examination and comparison of all of the facts and circumstances relating to the conduct involved, including the identity of the persons involved (including the victim, if any), and the timing, motive, and location of the crimes. No single factor is ordinarily dispositive; nor need all of the factors favor application of the exception in order for the offenses to be deemed inextricably intertwined or closely relatedwhich concepts we, like some other circuits, deem to be the same.... The greater the commonality of the factors and the more directly linked the conduct involved, the more likely it is that the courts will find the exception to be applicable." (United States v. Covarrubias, supra, 179 F.3d at p. 1225.) The Ninth Circuit's test is unworkably vague.[10]
The California Supreme Court also has not recognized an exception to the offense-specific rule. Our Supreme Court did mention the exception in People v. Wader (1993) 5 Cal.4th 610, 654, footnote 7, 20 Cal.Rptr.2d 788, 854 P.2d 80, but apparently only because the defendant had cited United States v. Hines, supra, 963 F.2d 255, for the proposition. Our Supreme Court did not adopt the exception, but merely recognized the Ninth Circuit had.
*272 In any event, Wader rejected the claim since, under the Ninth Circuit's test, the charged and uncharged offenses at issue were not "inextricably intertwined," but rather were "`logically distinct,'" in that the places, times and victims were all different. (People v. Wader, supra, 5 Cal.4th at p. 654, fn. 7, 20 Cal.Rptr.2d 788, 854 P.2d 80.)
In two recent cases, our state Supreme Court reiterated the offense-specific rule and rejected assertions that interrogating a defendant on uncharged offenses in those cases "materially interfered with his right to representation with respect to the formally charged offense," where defendants asserted the "charged and uncharged offenses are so inextricably enmeshed that factually and conceptually it was virtually impossible to distinguish the events." (People v. Bradford (1997) 15 Cal.4th 1229, 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259, citations and internal quotation marks omitted; People v. Sully (1991) 53 Cal.3d 1195, 1234, 283 Cal.Rptr. 144, 812 P.2d 163.)
In both cases, our Supreme Court found no interference because the uncharged offense was "wholly unrelated" (People v. Bradford supra, 15 Cal.4th at p. 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259) and because, "[although there was unquestionably a pattern to defendant's crimes, they involved distinct events, different victims, and different times." (People v. Sully, supra, 53 Cal.3d at p. 1234, 283 Cal.Rptr. 144, 812 P.2d 163.) Those remarks cannot be read as recognizing an exception to the offense-specific rule; rather, the court merely rejected the claims as framed by the defendants.
The California Court of Appeal for the Fourth Appellate District, Division Three, has opined that a "narrow exception" to the offense-specific rule "may apply," citing the Ninth Circuit's 1992 decision in United States v. Hines, supra, 963 F.2d 255. (In re Robert E. (2000) 77 Cal. App.4th 557, 561, 91 Cal.Rptr.2d 774.)
Robert E. apparently accepted at face value the assertion in United States v. Covarrubias, supra, 179 F.3d at page 1224, that the United States Supreme Court had implicitly applied the exception. (In re Robert E., supra, 77 Cal.App.4th at p. 561, fn. 4, 91 Cal.Rptr.2d 774.) It also noted the California Supreme Court had cited the exception in People v. Wader, supra, 5 Cal.4th at page 654, footnote 7, 20 Cal. Rptr.2d 788, 854 P.2d 80. (In re Robert E., supra, 11 Cal.App.4th at p. 562, fn. 4, 91 Cal.Rptr.2d 774.)
Robert E. explained various standards had been devised for deciding when charges are "inextricably intertwined" or "closely related," but that generally "courts examine the time, place, victims, and circumstances surrounding the offenses to determine whether a defendant is being pursued for essentially the same activities." (In re Robert E., supra, 11 Cal.App.4th at p. 562, 91 Cal.Rptr.2d 774; italics added [citing, inter alia, federal appellate decision requiring uncharged offense to "derive from the same `factual predicate' as the charged offense"].)
In Robert E. the accused, a juvenile, testified in his own defense at his earlier trial on charges of vandalism and assault, but the court found the allegations true and committed him to a juvenile camp. (In re Robert E., supra, 77 Cal.App.4th at p. 559, 91 Cal.Rptr.2d 774.) Over a month later, police officers interviewed him regarding his earlier testimony, and the juvenile admitted committing perjury. (Ibid.) He was then charged with perjury, his confession was admitted in evidence, and the perjury allegation was found true. (Ibid.)
On appeal, the juvenile claimed his motion to suppress the confession should have been granted because admitting evidence gleaned during the police interview violated his Sixth Amendment right to counsel on the vandalism and assault charges. (In re Robert E., supra, 77 Cal.App.4th at pp. 559-560, 91 Cal.Rptr.2d 774.) The Court *273 of Appeal affirmed the judgment. (Id. at p. 563, 91 Cal.Rptr.2d 774.)
As to the applicability of the "exception" under the facts before it, the Robert E. court found it was not error to admit defendant's confession (In re Robert E., supra, 77 Cal.App.4th at p. 562-563, 91 Cal. Rptr.2d 774) because the perjury was "logically distinct" from the charged offenses. (Id. at p. 562, 91 Cal.Rptr.2d 774.)
"The perjury occurred after Robert was accused of the underlying charges and was not part of the same conduct. [¶] ... We reject the defense suggestion that the Sixth Amendment right to counsel applies generally from arraignment through the appeal period. Such a rule would make it difficult to prosecute a defendant for any post-arraignment conduct somehow related to the pending charges. Massiah [v. United States, supra, 377 U.S. 201, 84 S.Ct. 1199] is not a license to intimidate witnesses, solicit the murder of witnesses, suborn or commit perjury, or attempt an escape." (In re Robert E., supra, 77 Cal. App.4th at pp. 562-563, 91 Cal.Rptr.2d 774, italics in original, fn. omitted.) In line with Maine v. Moulton, however, Robert E. also explained that the confession would not be admissible at any prospective retrial of the juvenile on the vandalism and assault charges. (In re Robert E., supra, 77 Cal.App.4th at p. 563, 91 Cal.Rptr.2d 774.)
However, the mere fact that the Robert E. court assumed the existence of an exception to the offense-specific rule (based on United States v. Covarrubias, supra, 179 F.3d 1219, and footnote 7 of People v. Wader, supra, 5 Cal.4th at p. 654, 20 Cal. Rptr.2d 788, 854 P.2d 80) should not be misconstrued as elevating to the status of law an exception to the offense-specific rule. There is no support for that view in either United States Supreme Court or California Supreme Court jurisprudence.
Because there is no exception to the offense-specific rule, and thus no exception to its corollary that evidence of crimes as to which the right to counsel has not yet attached is admissible at a trial of those offenses, defendant's claim premised on a supposed violation of his Sixth Amendment right to counsel regarding the solicitation crimes must fail.

D.

Even If There Were An Exception, It Would Be Narrow, and Defendant's Claim Would Fail Under Any Formulation of It
As we have shown, neither the United States Supreme Court nor the California Supreme Court has recognized an "inextricably intertwined" exception to the rule that the Sixth Amendment is offense-specific. Even if we were to assume they had, neither court has defined its scope and application. Meanwhile, the intermediate appellate court case law regarding the scope and application of the purported exception is murky. We conclude that under any formulation of the exception, if it exists at all, defendant's conversations with Bennett were admissible to prove the solicitation charges.
Any potential exception to the offense-specific rule must be very narrowly tailored to do no more than deter or remedy the problem which caused some courts to attempt definition of such an exception in the first place. According to the United States Court of Appeals for the Third Circuit, "[w]hen the pending charge is so inextricably intertwined with the charge under investigation, the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense.... To hold otherwise would allow the government to circumvent the Sixth Amendment right to counsel merely by charging a defendant with additional related crimes after questioning him without counsel present." (United States v. Arnold (3rd Cir.1997) 106 F.3d 37, 41, internal brackets, quotation marks and citations omitted.)
*274 Statements implicating a defendant on charges as to which the right to counsel has attached must be excluded to prevent "abuse by law enforcement personnel in the form of fabricated investigations" which would "risk[ ] the evisceration of the Sixth Amendment right recognized in Massiah." (Maine v. Moulton, supra, 474 U.S. at p. 180,106 S.Ct. 477.)
However, no species of official misconduct appears in this case. Nothing in the record remotely suggests the investigating officers set up the conversations with Bennett for the purpose of attempting to deprive defendant of his Sixth Amendment right to counsel on a pending charge. There is also no indication law enforcement officers purposefully delayed charging defendant with solicitation so they could obtain incriminating statements regarding a charged offense under the guise of investigating a different offenseindeed, the solicitation crimes did not occur until long after defendant was charged with false imprisonment and other crimes.
The officers' conduct here was not proactive, but reactive. It was triggered by defendant's expressed intent to arrange for a hit man to dissuade and seriously injure Rebecca. The police cannot be criticized for promptly investigating defendant's developing plan to silence Rebecca, but should be lauded for it. They had a duty to try to prevent harm to Rebecca. It is fortunate, but fortuitous, that defendant tried to hire someone who happened to be an undercover officer, rather than a real hit man, to attack Rebecca. The Constitution may not be subverted into a tricky mechanism by which defendant may gain insulation from use of evidence of his new crimes in a prosecution for those new crimes because they share a common target, defendant's wife, and are hinged by his obvious readiness to utilize a mercenary to harm her. No principle of constitutional law requires or even suggests such a result.
We shall not attempt to create and add another test to the cacophony of existing tests purporting to define an exception to the offense-specific rule. Rather, as already noted, we conclude that, if any such test exists, it must be very narrow, i.e., only when the charged and uncharged offenses are for the same crime or same course of criminal conduct, and simultaneously chargeable, may the courts exclude evidence of defendant's statements on subsequent offenses given to police. Only in such rare and narrow circumstances may an investigation be found to circumvent a defendant's Sixth Amendment right to counsel.
We therefore conclude that, if there is an exception to the offense-specific rule, it applies only when an uncharged offense is "factually and conceptually ... virtually impossible to distinguish" from (People v. Bradford, supra, 15 Cal.4th at p. 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Sully, supra, 53 Cal.3d at p. 1234, 283 Cal.Rptr. 144, 812 P.2d 163), and simultaneously chargeable with, the actually charged offense to which the right to counsel has already attached.[11] This is akin to the test framed by In re Robert E., supra, 77 Cal.App.4th at page 562, 91 Cal.Rptr.2d 774, i.e., "whether a defendant is being pursued for essentially the same activities." (Italics added.) Indeed, there really is no exception to the offense-specific rule, only a commonsense application of it.
Using a properly narrow test, we reject defendant's claim that his conversations with Bennett were inadmissible to prove the solicitation charges. The false imprisonment charge on which defendant was arraigned and obtained counsel on November 17, 1998, was based on acts he allegedly *275 committed on November 13, 1998. The witnesses to those acts were Habra, Ballard and Wanamaker. After committing the alleged false imprisonment, defendant was arrested and jailed, temporarily interrupting his alleged criminal conduct.
The solicitation crimes were conceived and pursued by defendant subsequent to and distinct from the alleged false imprisonment. They were born of his own malevolence and took place at a different time and place, although success in the new criminal enterprise was expected to terminate his liability for the earlier one. Because defendant was in custody, he had to act through someone who was not. Fortunately, but fortuitously, he unknowingly conscripted a law enforcement officer.
Three weeks had elapsed between the events giving rise to defendant's false imprisonment charge and his phone call to Detective Bennett then perceived by defendant as someone willing to scare or harm his wife and, if necessary, her children, sufficiently to persuade her to drop the pending charge.[12] The evidence of the solicitation crimes consisted of the tapes of the phone calls and the testimony of Bennett, Malim, and Nakabayashi. Such evidence is unrelated to the prior offense, beyond sharing a vulnerable victim whose demise would effectively end the case in which the prior offense was charged.
There was no juridically consequential link between the charged and uncharged offenses. True, they all involved Rebecca, as defendant's alleged victim of false imprisonment and intended victim of two criminal solicitations. That defendant intended to extinguish her to extinguish his pending criminal prosecution adds nothing to the Sixth Amendment analysis. These commonalities do not cobble, conceptually or constitutionally, the charged and uncharged offenses so as to implicate a judicial burden to vindicate the Sixth Amendment. Thus, the evidence of defendant's conversations with Bennett was admissible to prove the solicitation crimes charged in counts one and two.[13]
Since that evidence was admissible to prove counts one and two, the ineffective assistance of counsel claim collapses because failing to move to exclude that evidence was not deficient representation. (In re Wilson, supra, 3 Cal.4th at p. 950, 13 Cal.Rptr.2d 269, 838 P.2d 1222.) Finally, we also conclude that the ineffective assistance claim would fail even if we applied one of the intermediate federal appellate court tests mentioned above, since evidence regarding the solicitation crimes would have been admissible on those counts even under those arguably more lax tests.

E.

Trial Counsel's Performance Was Deficient as to Count Three, But Did Not Prejudice Defendant
As noted, incriminating statements elicited from a defendant after the right to counsel has attached to a charged offense are inadmissible to prove that offense, even if the statements pertain to a new and uncharged crime. (In re Wilson, supra, 3 Cal.4th at pp. 950-951, 13 Cal. Rptr.2d 269, 838 P.2d 1222.) A defendant's attempts to dissuade or prevent a witness from testifying may, of course, indicate his consciousness of guilt for the charged offense. (CALJIC No. 2.06; see People v. Hill (1995) 34 Cal.App.4th 727, 737, 41 Cal.Rptr.2d 39.)[14]
Thus, defendant's trial counsel was deficient in failing to seek a limiting *276 instruction or jury admonition that evidence of defendant's conversations with Bennett was admitted only as to counts one and two (and not count three); severance of the trial as to count three; or some other appropriate remedy. (In re Wilson, supra, 3 Cal.4th at pp. 950, 955, 13 Cal. Rptr.2d 269, 838 P.2d 1222 [where defendant is prosecuted only for murder and robbery, it is deficient performance not to object to inadmissible evidence of a plan to kill a witness].)
We conclude, however, the ineffective assistance of counsel claim still fails because defendant cannot show he was prejudiced by counsel's deficient performance. (In re Wilson, supra, 3 Cal.4th at p. 950, 13 Cal.Rptr.2d 269, 838 P.2d 1222.)
Most importantly, defendant was acquitted of false imprisonment. It is impossible for him to show that, but for his trial attorney's admittedly deficient performance, "the result would have been more favorable" to him on that charge. (In re Wilson, supra, 3 Cal.4th at p. 950, 13 Cal.Rptr.2d 269, 838 P.2d 1222.) Defendant received the best result possible.
In any event, during the phone conversations Bennett did not elicitand defendant did not makeany statements implicating defendant for false imprisonment. To the contrary, defendant asserted he was innocent of that charge: he told Bennett, "I want her to call the DA and tell him that she made it up. Which is the truth John," and asked Bennett to get Rebecca "to call the DA and say, `Look I made up the story (which is the truth) I made up the story.'" (Italics added.)
Thus, the evidence was on its face exculpatory on the false imprisonment charge, despite its possible indirect incriminatory nature flowing from the consciousness of guilt inference. However, because the trial court did not instruct the jury with CALJIC No. 2.06 or any similar instruction, that inference was likely not a significant factor in the jury deliberations as to count three.
Finally, the prosecution virtually ignored the evidence of the conversations with Bennett when it argued to the jury that defendant was guilty of false imprisonment. The prosecution's closing arguments on false imprisonment relied almost entirely on the testimony of witnesses Ballard, Wanamaker, and Habra.
Only once during closing arguments did the prosecutor refer to the solicitation offenses in relation to false imprisonment: "He hired someone to frighten[,] to intimidate[,] to dissuade Rebecca Keller from assisting in the prosecution of this false imprisonment case, and he falsely imprisoned her." The quoted remark came only after the prosecutor had extensively argued the merits of the false imprisonment charge based on the testimony of Ballard, Wanamaker and Habra. We doubt the later remark had an impact on the jury.
For these reasons, we conclude defendant's ineffective assistance of counsel claim fails as to count three as well.

II.
No Duty to Instruct Sua Sponte on Entrapment
Defendant asserts the court erred by failing sua sponte to instruct on the entrapment defense as to count one, solicitation to assault Rebecca with a deadly weapon or instrument or by means of force likely to produce great bodily injury.[15] He claims his first conversation with Bennett could support a jury finding that defendant only wanted the hit man to "scare" Rebecca *277 and that Bennett induced defendant to solicit the commission of a more serious crime, i.e., to at least "cut her up." We disagree.
"[E]ven in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (People v. Montoya (1994) 7 Cal.4th 1027, 1047, 31 Cal.Rptr.2d 128, 874 P.2d 903.) The duty extends to defenses. (People v. Breverman (1998) 19 Cal.4th 142, 157, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)
However, the duty to instruct on a defense arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (People v. Sedeno (1974) 10 Cal.3d 703, 716, 112 Cal.Rptr. 1, 518 P.2d 913, overruled on other grounds in People v. Breverman, supra, 19 Cal.4th at p. 149, 77 Cal.Rptr.2d 870, 960 P.2d 1094; accord, People v. Barton (1995) 12 Cal.4th 186, 195, 47 Cal.Rptr.2d 569, 906 P.2d 531, and People v. Montoya, supra, 7 Cal.4th at p. 1047, 31 Cal.Rptr.2d 128, 874 P.2d 903.)
At trial, defendant sought entrapment instructions based only on inmate Scott's conduct, not Bennett's, and thus was not relying on the defense under the theory now advanced on appeal.[16] Still, the defense was not inconsistent with defendant's theory of the case, since his counsel argued defendant did not want Rebecca injured and that Bennett elevated the severity of the crimes solicited in the conversation. Defense counsel also cross-examined Bennett about entrapment generally, without distinguishing between the counts being tried.
Therefore the question is whether, as to any count, "there [was] substantial evidence supportive of such a defense...." (People v. Barton, supra, 12 Cal.4th at p. 195, 47 Cal.Rptr.2d 569, 906 P.2d 531; People v. Sedeno, supra, 10 Cal.3d at p. 716, 112 Cal.Rptr. 1, 518 P.2d 913.) In this context, "substantial evidence" means "evidence sufficient to deserve jury consideration" (People v. Marshall (1997) 15 Cal.4th 1, 39, 61 Cal.Rptr.2d 84, 931 P.2d 262), i.e., evidence from which reasonable jurors "could have concluded that the particular facts underlying the instruction did exist." (People v. Lemus (1988) 203 Cal. App.3d 470, 477, 249 Cal.Rptr. 897; citations and internal quotes omitted.)
We resolve entrapment claims by examining the "nature and extent of police activity in the criminal enterprise." (People v. Barraza (1979) 23 Cal.3d 675, 689, 153 Cal.Rptr. 459, 591 P.2d 947.) The test is whether the police officer's conduct was "likely to induce a normally law-abiding person to commit the offense." (Id. at pp. 689-690, 153 Cal.Rptr. 459, 591 P.2d 947.) We presume "such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully." (Id at p. 690, 153 Cal.Rptr. 459, 591 P.2d 947.) Police may not "pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (Ibid.) Barraza remains the law. (People v. Watson (2000) 22 Cal.4th 220, 223, 91 Cal.Rptr.2d 822, 990 P.2d 1031.)
The record would not support a reasonable jury finding that Bennett performed an affirmative act likely to induce a normally law-abiding person to commit the crime charged in count one. (People v. *278 Barraza, supra, 23 Cal.3d at p. 690, 153 Cal.Rptr. 459, 591 P.2d 947.) To the contrary, the evidence shows Bennett, while posing as "John," merely provided chances for defendant to explain in more detail the nature of the crimes he wished the hit man to commit against Rebecca, an opportunity defendant willingly embraced.
Bennett did not pressure defendant to solicit the hit man to cut up or kill Rebecca. Even though defendant told Bennett, "For right now I just want her scared," and "I don't really want her dead," those comments do not show defendant was cajoled into seeking more violent means of accomplishing his goals. Nothing Bennett said during the conversation would have induced any normally law-abiding person to ask a hit man to assault his spouse with a deadly weapon or instrument or by means of force likely to produce great bodily injury.
Defendant claims Bennett's statement "you don't want me as your enemy" is evidence Bennett intimidated him into soliciting a more violent crime against Rebecca. Defendant takes the statement out of context, however. The point was the hit man would hold defendant to the higher price if he had to cut up Rebecca and would not take kindly to being stiffed on his bill. Bennett did not say he would consider defendant an enemy if defendant failed to demand greater violence against Rebecca.
The entrapment test is "designed primarily to deter impermissible police conduct...." (People v. Barraza, supra, 23 Cal.3d at p. 691, fn. 5, 153 Cal.Rptr. 459, 591 P.2d 947.) There was no impermissible conduct here.

DISPOSITION
The judgment is affirmed.
SCOTLAND, P.J., and RAYE, J., concur.
NOTES
[1] AH subsequent references to sections are to the Penal Code.
[2] Pursuant to a stipulation, the court reporter did not transcribe the contents of the tapes as they were played for the jury. However, the jury was provided with transcripts of the tapes prepared by the district attorney's office. On March 23, 2000, we ordered the record on appeal augmented with the tape transcripts used at trial.
[3] There was no evidence Scott had contact with law enforcement agents prior to this time.
[4] Usually we do not consider ineffective assistance of counsel claims on appeal and leave defendants to petition for a writ of habeas corpus where counsel's omission might have had a tactical purpose and the appellate record does not illuminate its basis. (People v. Phillips (1985) 41 Cal.3d 29, 61, 222 Cal.Rptr. 127, 711 P.2d 423.) However, we may address the claim on appeal if there could be no conceivable legitimate tactical purpose behind the omission. (People v. Diaz (1992) 3 Cal.4th 495, 558, 11 Cal.Rptr.2d 353, 834 P.2d 1171; People v. Pope (1979) 23 Cal.3d 412, 426, 152 Cal.Rptr. 732, 590 P.2d 859.) Here, we discern no tactical reason for not moving to suppress evidence of defendant's conversations with Bennett if there was a basis to do so. Therefore, we consider the ineffective assistance of counsel claim.
[5] Here the solicitation and false imprisonment charges were tried simultaneously, pursuant to a prosecution motion to consolidate the indictment and information. Defendant did not oppose that motion. On appeal, defendant does not contend his trial attorney erred by failing to oppose consolidation. For purposes of our analysis, it is not determinative that the charges were tried at the same time.
[6] Strictly speaking, there is no need to recognize an "exception" to the offense-specific rule. Labeling the concept under discussion an "exception" is merely a matter of semantics. As we will explain, the real question is whether the uncharged offense being investigated by policeeven if it is called something elseis essentially the same as the charged offense, such that the right to counsel should be considered to have also attached to the uncharged offense. However, since other courts and defendant call the concept an "exception," we will follow the same convention here for the sake of clarity.
[7] The decision of the Supreme Judicial Court of Maine states "[t]hat lengthy conversation focused on the upcoming trial on the charges against Moulton and Colson." (Maine v. Moulton (Maine 1984) 481 A.2d 155, 159.)
[8] The state court decision provides no additional detail. It merely states "[t]he recordings from the body wire produced additional evidence later used against Moulton." (Maine v. Moulton, supra, 481 A.2d at p. 158.)
[9] The state court decision held Moulton's recorded statements "may be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced." (Maine v. Moulton, supra, 481 A.2d at p. 161.) The procedural history related therein (id. at p. 158) shows such proceedings had not yet commenced as to burglary. The state court said police were free to gather information about "possible crimes, such as the threats against witnesses, not already the subject of judicial proceedings," (id. at p. 160, italics added and italics omitted) but did not restrict the use of the recordings to that purpose.
[10] To the extent defendant might continue to assert Maine v. Moulton and United States v. Covarrubias are relevant to whether the solicitation charges are inextricably intertwined with the false imprisonment charge, both cases suggest his conversations with Bennett were admissible as to the solicitation charges. (Maine v. Moulton, supra, 474 U.S. at p. 180 & fn. 16, 106 S.Ct. 477 [permitting admission of evidence on retrial as to, at a minimum, the plan to kill the witness]; United States v. Covarrubias, supra, 179 F.3d at p. 1224 [interpreting Maine v. Moulton as "allowing for the possibility that the information could be used in a subsequent trial regarding the plan to kill the witness"].)
[11] The legal cliches "inextricably intertwined" (United States v. Hines, supra, 963 F.2d at p. 257) and the similar "inextricably enmeshed" (People v. Bradford, supra, 15 Cal.4th at p. 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259; People v. Sully, supra, 53 Cal.3d at p. 1234, 283 Cal.Rptr. 144, 812 P.2d 163) are not helpful to pertinent discourse. They are little more than juridical shibboleths.
[12] Defendant was adequately in command of apparent circumstances to demand and get a photograph which purported to show his brutally murdered wife. When shown the altered photograph, he displayed no emotional distress and quickly agreed to provide the previously agreed upon exchange.
[13] Contrary to defendant's suggestion, whether the solicitation and false imprisonment charges could be joined for trial (§§ 954, 954.1) is not determinative of whether the charges should be considered essentially the same offense for Sixth Amendment purposes.
[14] In relevant part, CALJIC No. 2.06 provides: "If you find that a defendant attempted to suppress evidence against [himself] ... in any manner, such as [by the intimidation of a witness] ..., this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (Original brackets.)
[15] Defendant concedes he was not entrapped as to count two, soliciting Bennett to dissuade Rebecca as a witness, and that no entrapment instruction was required on count two.
[16] Defendant's trial counsel requested the instructions based on the conversations with Scott after Scott gave defendant the phone number, during which Scott assertedly told him what to say to the hit man. Counsel argued Scott was acting as a police agent at those times. The trial court refused the instructions. On appeal defendant abandons the view that entrapment instructions were necessary on the theory urged at trial; instead he claims they were required sua sponte based solely on his December 2, 1998, phone conversation with Detective Bennett.